Marshall, C. J.,
 

 dissenting. While I do not concur in the conclusions’ reached by the majority, or in the reasons set forth in the majority opinion, I would not permit myself to write a dissenting opinion except for-the fact that it is stated in the majority opinion that the position of the plaintiff in error “condemns both the jurors and the jury system” and again that it is “a base estimate of the integrity of jurors generally,” and “a contempt for the jury system.” I am not willing that my silence as one of the minority shall be construed as an admission that I personally entertain those views.
 
 *163
 
 No fault can be found with the first and second paragraphs of the syllabus. The third is likewise above criticism, if the Casualty Insurance Company is actively or ostensibly engaged in making the defense.
 

 In the majority opinion it is suggested that a casualty insurance company was actually conducting the defense with its counsel and investigators present at the trial table. If it is meant by this that it was patent to the jurors that an insurance company was an indemnitor, and directly interested in the event of the suit, then no prejudice has resulted, and the opinion is wasted effort. The case has been argued in this court on the theory that there was nothing to indicate that the defendant was insured, and that the
 
 voir dire
 
 examination was a deliberate effort to apprise the jurors of that fact and thereby to create in their minds whatever bias might naturally follow that disclosure. It is always proper, where an insurance company is a party to the suit, or where it is clearly apparent that an insurance company is making the defense, to inquire what insurance company it is and whether any of the jurors have an interest in the company, or whether there Is any relationship of principal and agent, master and servant, or employer and employee, between such company and the prospective jurors; but to go beyond this seems to me to invade the realm of improper influence.
 

 The issue to be determined by the jury is whether the actual defendant to the suit has been guilty of negligence, and, if so, whether that negligence is a proximate cause of the injury, and, if those matters are determined in plaintiff’s favor, what damage has been suffered. No one would contend that a different rule of negligence or a different measure of dam
 
 *164
 
 age would apply because tbe defendant may have taken the precaution to purchase indemnity insurance. The question of propriety of the
 
 voir dire
 
 examination is only presented where an insurance company is indemnitor but is not actively participating in the defense. And whatever may be said pro and con on this subject, it must be clearly apparent to every one that the reason for pursuing the examination, where the insurance company is not ostensibly interested, is not for the purpose of eliminating interested jurors, but to arouse the feelings of those who are accepted as jurors. Such questions are asked for the purpose of insinuating, or, as it sometimes happens, plainly indicating the background presence of an insurance company. The fact that such methods are resorted to by counsel for the plaintiff, and that they are so stoutly resisted by counsel for the defendant, is proof sufficient that the experiences of the past have shown that verdicts are facilitated and the amount of recovery augmented by such means.
 

 The fact is that stockholders and employees of insurance companies are not so numerous in any community, neither do they constitute such a large proportion of the entire number of persons available for jury service, that there is any likelihood or probability that there would be more than one or two of them in any panel of twelve; neither is it probable that they would corruptly try to defeat a recovery on that account. There are so many indemnity companies that the juror interested in a single company could not know whether his own, or some other company, if any, is interested. In 1912 our Constitution was amended to meet just such a situation as this by
 
 *165
 
 permitting nine jurors to render a verdict. Surely it is better that one or two of
 
 the three
 
 inconsequential jurors should remain on the panel, though remotely interested, than that the entire panel should be subjected to the possible taint of prejudice.
 

 It was suggested in argument that courts have a very large measure of discretion in setting aside verdicts and granting new trials and that such means are available to correct any injustice appearing in the verdict; but it may be answered that an ounce of prevention is better than a pound of cure and that the jury should not be permitted to range over large areas of possible error and prejudice with the expectation of requiring one new trial after another to eventually correct the same. The real fact is that under our present system in Ohio there are many varieties of circumstances and conditions where judges are powerless to prevent unjust verdicts, and where the remedies of setting them aside and granting new trial have become rather strict.
 

 It may further be answered that a new trial, with all its attendant expense, delay, and possibilities of similar errors in a second, third, or fourth trial, does not afford a complete solution to the problem. • If a building contract would forbid the owner to make any protest concerning violation of the contract during the course of construction, and provide that he might only have the recourse of having the building torn down and rebuilt two or three or four times, until finally constructed according to the plans and specifications, the sanity of the party to such a contract would be seriously questioned. The word “prejudice” seems a harsh term to apply to the state of mind of a' juror who is called upon to decide be
 
 *166
 
 tween a physically injured person, on the one hand, and an insurance company, on the other, which for a premium has agreed to indemnify the defendant. It is, however, a condition and not a theory that jurors and judges as well are frequently influenced by the poverty or wealth, the social status, of the parties, and a score of other matters which should not enter into their deliberations. Perhaps, after all, the word “prejudice” is not an accurate term to express the situation. It is more accurate to speak of it as one of the weaknesses of human nature, which are possessed by men generally, and therefore becomes a part of the average opinions and judgment of the jurors. It is more correct to say that jurors, and judges, as well, sometimes reach a wrong conclusion because of an erroneous trend of thought. By whatever expression it may be described, we should not deceive ourselves into thinking that the conclusions of jurors are always accurate, or that their reasoning is always sound, or that justice is always the product of their deliberations.
 

 The jury system has become so hedged about by unnecessary difficulties, and subjected to so many handicaps, that a group of geniuses could not make it function perfectly. Its primary as well as its ultimate purpose is solely to determine issues of fact. In practice, however, it does not always accomplish its purpose. A general verdict makes no findings of fact, and while a general verdict is generally consistent with the weight of the evidence, and the result a logical solution of the problem submitted, it is not always so, and that it is sometimes so is a great tribute to the intelligence of the jury and a
 
 *167
 
 defense of the jury system so cogent and powerful that any defense of mere eulogy is weak and futile by comparison. That the verdict is not always a logical deduction from the evidence does not materially reflect upon the intelligence or integrity of the jury itself. It may be charged in large part to the system by which the jury is made to function. Instead of permitting the jury to confine its deliberations to matters of fact, and limit its verdict to specific findings of fact, which it is well qualified to do, the judge who presides over the trial delivers a lengthy dissertation upon the law which should govern the controversy, which dissertation is sometimes of doubtful accuracy, involved in verbosity, prolixity, and ambiguity, and always couched in technical terminology. The jury is then instructed that it must consider all the evidence and all the law and render a general verdict which makes no reference to either fact or law, but which is expected to reflect an accurate application of sound law to the true facts of the controversy. An unjust verdict is the inevitable result of involving good men and a good system in so many difficulties and complexities that highly trained experts, would be unequal to the task.
 

 While no institution for fact finding comparable to the jury system has ever been found, and while I know of no permanent system which will work better, I am not deaf to the criticism which is being heaped upon it; neither am I blind to those patent defects and the abuses which have crept into it during the last two or three decades. The judicial branch of our government is on trial before the bar of public opinion. However unjustly, it is undeni
 
 *168
 
 able that the courts also have been placed on the defensive. Judges and lawyers must answer for the things for which they are really responsible, but juries must bear the blame which is justly due to them. I agree heartily with the quotations found in the majority opinion from
 
 Sioux City & P. Rd. Co.
 
 v. Stout, 84 U. S. (17 Wall.), 664, 21 L. Ed., 745, and
 
 Davidson Steamship Co.
 
 v.
 
 United
 
 States, 205 U. S., 191, 27 S. Ct., 480, 51 L. Ed., 764, but I deny that in all instances the jury embodies the average intelligence, judgment, and enlightenment of citizens generally.
 

 The theory of the jury system is not that it secures the average judgment of citizens generally, but rather the average judgment of the better element of citizens chosen by approved processes of selection. The quality of a jury will be better than the quality of citizens generally only if the processes of selection are sound and courageously executed. If large classes of the better element of citizens are excused from jury service altogether, and if liberal challenges for those are freely exercised, and if a generous number of peremptory challenges are likewise permitted and exercised, and if a judge has a habit of excusing those whose business cares would be inconvenienced by jury service, and if, as happens in certain communities, the jury wheel has been filled with the names of those who clamor for selection as a reward of service rendered to the dominant political party, then the quality of the jury becomes far below the quality of citizens generally. That some of these things occur in every community and all of them occur in some communities is a fact which no fair-minded person will deny.
 

 
 *169
 
 In the English practice little time is devoted to impaneling a jury. No barrister would be permitted to make an extended and detailed examination of individual jurors. In many counties of this state the trial judge takes the initiative in the
 
 voir dire,
 
 and counsel may make such further inquiry as seems proper, but may not again cover the ground already covered by the judge. Who shall say that the fact finding of the jury in such counties, or in the English courts, is inferior in quality to that in those counties where the jury is subjected to a searching inquisition, and where days and even weeks are sometimes consumed in the unworthy efforts of a skillful advocate to secure a jury of specially selected men whom he thinks can be molded to his will and become advocates of his cause in the jury room? A jury thus selected does not typify the boasted “twelve men of the average of the community.” The federal Supreme Court decision quoted in the majority opinion states: “It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions,” etc. This is absolutely sound, but the manipulations of a
 
 voir dire
 
 examination of the character indorsed by the majority opinion result in securing twelve men of a single way of thinking, and with preconceived conclusions, which require a large amount of evidence to overcome. Under the guise and the pretended purpose of eliminating a single juror having a possible interest and disquali-. fication, the real purpose is to secure a panel of twelve with inflamed sympathies and prejudices which can bé capitalized to one party’s profit. If it is proper to inquire into the interest of jurors in
 
 *170
 
 indemnity insurance cases, it is equally pertinent to inquire into their personal histories, their political inclinations, their religious affiliations, their economic trend of thought, their moral character, their social habits, their hereditary traits, and a score of other matters equally irrelevant to the controversy. The majority opinion and decision open the door to a thousand angles and sidelights in trials, which can only tend to confusion and injustice. The fundamental theory of the jury system is that it calls for the average judgment and reflects the average knowledge and experience of men in human affairs, not the warped and specialized viewpoint of men who have been selected by the skillful manipulations of shrewd counsel through the processes of elimination and challenge.
 

 Jury service must be made compulsory on the part of all classes of citizens without exception and without release therefrom for trivial excuses. A guidebook of general instruction and training should be placed in the hands of every juror at the time of his summons and a few lectures delivered by the judge to the array before their term of service begins. Their verdict should be confined strictly to findings of fact, leaving the conclusions of law to be deduced by the court in rendering judgment. The judge who presides over the trial must be given a larger share in advising them upon the interpretation of evidence. The
 
 voir dire
 
 examination should be. largely, almost exclusively, conducted by the court. The ban upon the disclosure of corrupt practices in the jury room must be removed. Judges should be given a larger authority and discretion over verdicts. Until such time as these things, or
 
 *171
 
 many of them, shall be brought to pass, the well-phrased eulogy of the United States Supreme Court upon the jury system will not have full application.
 

 The majority opinion states: “We are unable to frame a practical rule that will protect the litigants against any inadvertent acceptance of an interested or biased juror and at the same time- prevent the inquiry of a juror on his
 
 voir dire
 
 examination as to the existence or nonexistence of such interest or bias.” We are prepared to suggest two methods, either of which will bring about the desired result without prejudice to the defendant, whether insured or not: .First, let the judge conduct the examination on this point after first stating that he has no knowledge whether or not the defendant is insured, and that they must assume that he is not insured; second, let a questionnaire be submitted to each juror when the summons is served on him, making minute inquiry as to his connection with or relation to automobile liability insurance, the answers to be placed on file in the clerk’s office and to be available at all times to counsel. If they show cause for challenge under the statute, the matter can be privately argued to the court. If no statutory cause is shown, the peremptory challenge is available. The majority opinion inquires what there is ‘ ‘ about the respectable, substantial and all-pervading business of insurance that would require a different rule to be adopted with reference to it than is adopted with reference to every other business?” etc. The answer is that the rule is not different, but that a different method of approach becomes necessary because automobile negligence cases constitute a very large proportion of the whole number of litigated cases, and because
 
 *172
 
 experience has shown that parties insured for $5,000 frequently are subjected to verdicts for $10,000, $15,-000, or more.
 

 The majority opinion further states that: “It is matter of common knowledge that automobile owners rather generally carry casualty insurance. ” This is an assumption of fact which is contrary to well-authenticated statistics on that subject. ‘ In 1925, when there were 1,400,000 automobiles in this state, statistics show that only 14 per cent, of them were covered by indemnity insurance, while 86 per cent, were uninsured. Today there are more than 1,700,-000 automobiles in Ohio and there is no reason to believe that a larger proportion of them are insured. After this decision is published the owner of an automobile will be between the upper and nether millstone. If he omits to carry insurance, he will carry a very great risk. If he carries a $5,000 policy, which is the amount usually carried, ,he runs a greater risk of an adverse verdict, and that verdict may be enormously larger than the amount of the policy.